IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VAN WYATT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-1801 |
| | § | |
| AMEC CHOICES BENEFITS PROGRAM | § | |
| LONG TERM DISABILITY INSURANCE | § | |
| PLAN, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Van Wyatt, brings this action against defendant, AMEC Choices Benefits Program Long Term Disability Insurance Plan ("Plan"), for denial of long-term disability benefits and clarification of rights to future benefits pursuant to § 502(a) of the Employee Retirement Income Security Act (ERISA) codified at 29 U.S.C. § 1132(a).[1]  Pending before the court are Defendant's Motion for Summary Judgment (Docket Entry No. 9), Plaintiff's Motion to Exclude (Part 2 of Docket Entry No. 11), and plaintiff's Motion to Modify Docket Control Order to allow him to file an out-of-time motion for summary judgment (Docket Entry No. 17).  For the reasons explained below, the plaintiff's motion to strike and motion to modify docket control order will be denied, defendant's motion for summary judgment will be denied, and the parties will be ordered to submit trial briefs within twenty (20) days.

---

[1]See Plaintiff's Original Complaint, Docket Entry No. 1, ¶ 1.

## I.  Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986). Entry of summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  Factual controversies are to be resolved in favor of the nonmovant "only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## II.  Factual and Procedural Background

Beginning on May 2, 1999,[2] plaintiff held the position of superintendent at U.S. Pipeline, Inc. ("U.S. Pipe"), "a subsidiary of AMEC, Inc. ("AMEC"), who had contracted with Liberty Life [Assurance Company of Boston ("Liberty Life")] for a policy to provide long-term disability coverage to AMEC employees."[3]

**A.   Plaintiff's Medical History While Employed by U.S. Pipe**

Plaintiff's first visit to primary care physician (PCP), Dr. Charles Lawson, was in July of 1996 for an examination and treatment of high blood pressure.[4]

On January 21, 2000, plaintiff visited Dr. Lawson and complained of panic attacks.[5]

On January 30, 2000, plaintiff presented to the emergency room at Columbia Clear Lake Regional Medical Center complaining of severe chest pain, and when tests ruled out cardiac problems, he

---

[2]Plaintiff's Reply to Defendant's Motion for Summary Judgment, Docket Entry No. 11, p. 6 (citing Administrative Record (AR), Exhibit A included in Defendant's Appendix to its Motion for Summary Judgment, Docket Entry No. 11, p. 1). Each page of the AR contains two numbers, one labeled "Def. App." and one labeled "Liberty/Wyatt." The page cites in this Memorandum Opinion and Order are to the "Def[endant's App[endix]" numbers.

[3]Defendant's Motion for Summary Judgment, Docket Entry No. 9, p. 2. See also Plaintiff's Reply to Defendant's Motion for Summary Judgment, Docket Entry No. 11, p. 6 (recognizing that U.S. Pipeline is one of the companies covered by the AMEC Plan).

[4]AR at p. 290

[5]Id. at p. 269.

was diagnosed as having suffered a panic attack.[6]  Plaintiff had
similar emergency room experiences on three other occasions in the
year 2000:  (1) on April 17, 2000, plaintiff presented to the
emergency room at Northwest Regional Hospital in Corpus Christi,
Texas, where his complaints were diagnosed as a panic attack;[7]
(2) on August 10, 2000, plaintiff presented to the emergency room
at Bryan W. Whitefield Memorial Hospital in Demopolis, Alabama;[8]
and (3) on September 28, 2000, plaintiff presented to Flagstaff
Medical Center in Flagstaff, Arizona, where symptoms that were
suspicious of myocardial infarction were again diagnosed as a panic
attack.[9]

On February 8, 2001, plaintiff's wife visited Dr. Lawson and
told him that plaintiff was "too ashamed to come to the doctor
about this."[10]  She explained that plaintiff was preparing to
relocate to California for a seven-month job supervising 300 men in
the oil industry, that his symptoms were so bad he was not sure he
could go, that she came to the doctor on his behalf because she was
desperate to make him feel better  and because he had inquiries

_____

[6]Id. at pp. 383-392, esp. 383-384.

[7]Id. at pp. 393-397, esp. 393-394.

[8]Id. at pp. 398-423.

[9]Id. at pp. 372-382, esp. 373-374, and 380.

[10]Id. at p. 256.

about whether he would qualify for disability.[11]  Dr. Lawson noted

three assessments:

> Assessment No. 1:  The patient needs to grab his problem
> by the horns and deal with it.  It is impossible to get
> psychological counseling when he is not putting down
> roots in a consistent fashion.  He may need six months of
> psychotherapy to root out the problems.
>
> Assessment No. 2:  Check dosing that he is taking on
> Xanax.  Consider increasing dosing.
>
> Assessment No. 3:  Check if he is taking Paxil and work
> to get dose up to 40 mgs advising the wife that it may
> take 3 or 4 weeks after he is on 40 mgs for him to get
> some relief but that this really does not get to the
> underlying issues.[12]

On February 12, 2001, Dr. Lawson increased plaintiff's dosage of

Xanax from .5 mgs to 1.0 mgs.[13]

On February 22, 2002, Dr. Lawson wrote that plaintiff had

"been in Chad for some time now in Africa," and that "[h]is anxiety

is doing much better perhaps due to the Paxil."[14]

On July 5, 2002, Dr. Lawson wrote that plaintiff "complains of

nausea with the higher does of Paxil.  However, that has decreased

his anxiety and he is doing much better with his anxiety and panic

attacks."[15]  Dr. Lawson decreased plaintiff's dose of Paxil and

---

[11]Id.

[12]Id.

[13]Id. at p. 255.

[14]Id. at p. 250.

[15]Id. at p. 246.

advised him that the decreased dosage may trigger increased anxiety.[16]

## B.   Plaintiff's Medical History While on Short-Term Disability

On March 1, 2003, plaintiff applied for short-term disability benefits, which he received from April 1 to September 30, 2003, in the amount of $6,500 per month.[17]

On March 4, 2003, Dr. Lawson wrote a letter in which he recommended that the plaintiff be considered "for a short term disability."[18]  Dr. Lawson explained that

> [i]n the last several years the patient has had increasing problems with chest pain, palpitations and inability to function due to severe anxiety that is job related.  The symptoms were so severe that Mr. Wyatt was admitted to the hospital in 2000 for chest pain and had a cardiac work-up which was negative.  Since then he has been on a multitude of medications to try and control his symptoms.  Treatment has been complicated by the fact that he stays here in Houston for very short periods.  His job usually takes him over seas for extended periods making monitoring his drugs and any consistent cyclo-therapy program totally impractical.
>
> He notes anxiety spells occurring in the afternoon at work when he observes co-workers undertaking dangerous things.  His most recent job involved New York where several of his operators were arrested for illegal activity with the Mob.  He is dependent on Ambien to sleep at night.  He has symptoms on a daily basis to the point that he freezes up and can't function.

---

[16]Id.

[17]Id. at p. 353.

[18]Id. at pp. 304-305.

At this time I am placing him on additional therapy with
Paxil CR 25 mgs 1 a day, Xanax 1 mg po bid prn and Ambien
10 mgs poq hs.   Additional things are undertaken to
control his hypertension.  He is referred to psychiatry.
It is possible that with an extended period of psycho-
therapy he may be able to resume his useful function in
a period of one to three months.  However, it is possible
that that may not happen.[19]

On March 21, 2003, Dr. Lawson wrote

Mr. Wyatt is seen with a history of panic attacks.  Since
last visit I have started the process of trying to get
him a psychological disability.  Today he woke up with
nausea, light headedness and dyspnea.  In fact he woke up
at 3 AM and wasn't able to go back to sleep.  He felt
terrible and thought he was dying.  He couldn't even
drive and had his wife drive him over here.  He has made
his first visit to the psychologist, Dr. Sam Maruello.
He is very pleased with Dr. Maruello's care.
Psychological battery has been ordered.

He has not been taking his Xanax on a prophylactic basis
and when he does take it he only takes half a tablet.  He
is taking his Paxil.  He reports that as soon as he got
to the office and lay down on the table for the EKG he
felt fine and all of his symptoms went away in a matter
of seconds and he remains symptom free at the time of my
exam. . . .

Assessment:  Panic attack.  The patient is to continue
working with his psychologist.  He is to take his Xanax
½ tablet twice a day prophylactically.  If he feels the
symptoms returning he should not hesitate to take the
second half of the pill.[20]

---

[19]Id.

[20]Id. at p. 241.

Plaintiff's period of short-term disability began on April 1, 2003.[21]

On May 1, 2003, plaintiff had his first appointment with a psychiatrist, Mohammed Ayoub, M.D.[22] Dr. Ayoub's notes state that plaintiff reported experiencing at least three panic attacks per week.[23]

On May 30, 2003, Dr. Lawson wrote an update on plaintiff's care in which he stated:

> It has been close to two months since we recommended
> temporary disability.  During that time he has been under
> treatment with multiple drugs for anxiety and panic
> attack.   He has been seeing a psychiatrist and a
> psychologist going through relaxation therapy sessions.
> Unfortunately, he continues to have a substantial amount
> of anxiety and estimates panic attacks at two per week.
> These panic attacks are usually triggered by phone calls
> from work with co-workers who seek his advise [sic] to
> solve problems.  I have recommended that he change his
> phone number and return his cell phone so that they
> cannot reach him.  However, it is beginning to look as if
> he will not be able to return to his previous field of
> endeavor.   I think that he will probably need at least
> six months of psychotherapy before a more definitive
> decision can be made, however.[24]

On July 3, 2003, Dr. Ayoub wrote that plaintiff was

---

[21]<u>Id.</u> at p. 353.

[22]<u>Id.</u> at p. 369.

[23]<u>Id</u>.

[24]<u>Id.</u> at p. 357.

a patient in his clinic.  He has been diagnosed with Panic Disorder with Agoraphobia.  I have been seeing Mr. Wyatt since May 2003.  He has worked with oil companies in some of the most disturbed parts of the world under stringent security conditions with armed guards with him on many occasions.  He always felt his life is on the line and that he can die anytime.  Working in these circumstances, he developed intense fear and started having panic attacks.  They were so severe that he ended up in the hospital Emergency Room on many occasions.  Initially his Primary Care Physician treated him.  As his condition worsened, he was referred to a psychologist and to me.  Even with continuing therapy and medication management, he is getting panic attacks.  The attacks get worse, when his colleagues on phone consult him.  With volatile and violent situation in Iraq, his condition is not getting any better.  He needs to be in continuous psychiatric care.  It is very difficult at this time to give a good estimate of time when he will be fully symptom free.  He at least would need 6 months to a year of psychotherapy and psychiatric care.  He would not be able to go back to work until that time.[25]

C.   **Plaintiff's Claim for Long-Term Disability Benefits**

By letter dated August 26, 2003, U.S. Pipe informed plaintiff that his short-term disability would expire on August 31, 2003, and provided him forms to fill out for long-term disability.[26]  In September of 2003 plaintiff filed for long-term disability benefits on grounds that he had been unable to work since February 28,

---

[25]Id. at p. 360.

[26]Id. at p. 196.

2003.[27]  On his Disability Claim Form plaintiff stated that he began
to experience panic attacks in the year 2000, and he described the
onset and nature of his illness as follows:

> I would have trouble breathing & having nausea, I thought
> I was having a heart attack.  On the job, when I observed
> a dangerous work situation is when I noticed this
> starting.  I went to the E.R. @ different hospitals
> (Alabama, Arizona, Texas) before Dr. Lawson finally
> diagnosed me with hypertension, anxiety, and panic
> attacks.[28]

The Plan is an employee welfare benefit plan governed by
ERISA.  Liberty Life is the claims administrator of the Plan.[29]  The
parties agree that to qualify for long-term disability benefits the
Plan "requires only that [plaintiff] be unable to do his own
occupation."[30]

1.   Initial Review

Before issuing its first denial of plaintiff's claim Liberty
Life reviewed a description of the superintendent's position

_____

[27]Id. at p. 197 (Disability Claim Form).

[28]Id.

[29]Plaintiff's Reply to Defendant's Motion for Summary Judgment,
Docket Entry No. 11, p. 1.

[30]See id. at p. 4, and Defendant's Motion for Summary Judgment,
Docket Entry No. 9, p. 16.  See also Group Disability Income
Policy, Exhibit C included in Defendant's Appendix, Docket Entry
No. 10, section 2 (AR at p. 433, "'Disabled' means during the
Elimination Period and the next 24 months of Disability the Covered
Person is unable to perform the material and substantial duties of
his occupation on an Active Employment basis because of an Injury
or Sickness").

provided by AMEC,[31] and supplemented by an addendum provided by Lowell E. Brien, Chief Engineer for U.S. Pipe;[32] a review of plaintiff's medical records conducted by psychiatrist, Dr. Robert Polsky;[33] a labor market survey conducted by WorkSource, Inc.;[34] and an evaluation conducted by a vocational case manager.[35]  Liberty Life denied plaintiff's claim for long-term disability benefits in a letter dated December 5, 2003, that informed plaintiff that

> [b]ased on the medical information in relation to your occupation requirements, you are able to perform the duties of your Own Occupation.  In Dr. Polsky's review of your medical records he indicated that you could perform your occupation in a "safer environment" the labor market survey that was conducted verified that your occupation of Superintendent could be performed within the continental U.S. without any job pressures or fears outside of standard employment.  This is further supported by the fact that you have been performing your job . . . in the United States since 1999.  Based on the medical and vocational information, you do not meet your policy's definition of disability, and we must deny your claim for benefits effective September 29, 2003.[36]

2.   <u>Review on Appeal of Initial Denial</u>

---

[31]AR at p. 131.

[32]<u>Id.</u> at p. 107.

[33]<u>Id.</u> at pp. 99-103.

[34]<u>Id.</u> at pp. 85-92.

[35]<u>Id.</u> at pp. 108-119.

[36]<u>Id.</u> at p. 83 (citing Dr. Polsky's report, which appears at pp. 99-103).

Plaintiff appealed Liberty Life's denial of his claim and in support of his appeal submitted a narrative report prepared by his treating psychologist, Dr. Marullo.[37]  Dr. Marullo stated that

> [a]t Mr. Wyatt's request I am providing information about his psychiatric disorder.  Apparently denial of his claim for disability is based on a review of his medical records by Dr. Polsky.  There are substantial differences of opinions between Dr. Polsky and myself on the nature and degree of Mr. Wyatt's disorder.[38]

Based on an evaluation performed on December 30, 2003, Dr. Marullo arrived at a diagnosis of plaintiff's condition that differed from the diagnosis made by Dr. Polsky.[39]  Dr. Marullo concluded that "[i]t is Mr. Wyatt's intention to return to work as soon as possible.  For that reason he has continued to pursue treatment to alleviate or overcome his Disorder but currently he remains disabled."[40]

Liberty Life referred plaintiff's medical file to a psychiatrist, Dr. Andrew Brown, who reviewed it, and on February 4, 2004, reported to Liberty Life that he agreed with Dr. Polsky's opinions that plaintiff's anxiety is related to dangerous job assignments, and that plaintiff would benefit from a more

---

[37] <u>Id.</u> at pp. 58-64.

[38] <u>Id.</u> at p. 58.

[39] <u>Id.</u> at pp. 58-63.

[40] <u>Id.</u> at p. 64.

aggressive medication regime.[41]  Dr. Brown also stated that he believed plaintiff was not motivated to work.[42]  Liberty Life denied plaintiff's appeal in a letter dated March 1, 2004.[43]  The stated reason for the denial was that "the medical documentation does not support limitations preventing [plaintiff] from performing the material and substantial duties of his occupation, as a Superintendent, throughout the Elimination Period and beyond. Therefore, [plaintiff] does not meet the definitions under the terms of the Amec, Inc. long-term disability policy, and benefits are not payable."[44]

### III.  <u>Defendant's Motion to Strike</u>

Characterizing the peer review psychiatrists, Dr. Polsky and Dr. Brown, as "expert witnesses," and citing <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 113 S.Ct. 2786 (1993), plaintiff moves to strike their reports from the record.[45]  In <u>Daubert</u>, 113 S.Ct. at 2795, the Supreme Court held that a district judge asked to admit

---

[41]Plaintiff's Reply to Defendant's Motion for Summary Judgment, Docket Entry No. 11, pp. 8-9 (citing AR at pp. 45-49).

[42]AR at pp. 47-48.

[43]Exhibit D included in Docket Entry No. 11, pp. 462-467.

[44]<u>Id.</u> at p. 466.  See also Group Disability Income Policy, Exhibit C included in Defendant's Appendix, Docket Entry No. 10, section 2 (AR at p. 433).

[45]Plaintiff's Reply to Defendant's Motion for Summary Judgment, Docket Entry No. 11, pp. 4-5.

scientific evidence must decide whether the evidence "is not only relevant, but reliable." Plaintiff argues that the reports of Dr. Polsky and Dr. Brown should be stricken because defendant has not designated them as experts, and because their opinions lack foundation and have not been examined for reliability.[46]  Arguing that the reports of Dr. Polsky and Dr. Brown are included in the administrative record and that the administrative record is what it is, defendant argues that the standards established by the Supreme Court in <u>Daubert</u> for expert witness reports are inapplicable to the court's review of the administrative record in this ERISA case.[47] The court agrees.

Plaintiff himself has recognized that resolution of the motion for summary judgment now before the court requires review of the administrative record.[48]  <u>See</u> <u>Meditrust Financial Services Corp. v. The Sterling Chemicals, Inc.</u>, 168 F.3d 211, 213 (5th Cir. 1999) ("Assuming that both parties were given an opportunity to present

---

[46]<u>Id</u>.

[47]Defendant's Reply to Plaintiff's Response, Docket Entry No. 12, pp. 6-8.

[48]See Plaintiff's Reply to Defendant's Motion for Summary Judgment, Docket Entry No. 11, pp. 3-4 ("The Court reviews the administrative record to determine whether Liberty abused its

discretion in determining Wyatt to not be disabled.").  See also Joint Discovery/Case Management Plan, Docket Entry No. 6, p. 2 at no. 8 ("this is an action for review on an administrative record").

-14-

facts to the administrator, [this court's] review of factual determinations is confined to the record available to the administrator."). In <u>Vega v. National Life Ins. Services, Inc.</u>, 188 F.3d 287, 300 (5th Cir. 1999) (en banc), the Fifth Circuit held that "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." Plaintiff does not dispute that the reports of Dr. Polsky and Dr. Brown belong to the administrative record under review, and has not cited any authority that would allow the court to add or subtract from that record. <u>See id.</u> at 299 ("Once the administrative record has been determined, the district court may not stray from it except for certain limited exceptions. To date, those exceptions have been related to either interpreting the plan or explaining medical terms and procedure relating to the claim."). Accordingly, the court concludes that plaintiff's motion to strike the reports of Dr. Polsky and Dr. Brown will be denied. <u>See</u> <u>Hufford v. Harris Corp.</u>, 322 F.Supp.2d 1345, 1358-1359 (M.D. Fla. 2004) (rejecting argument that reports of peer review physicians should not have been considered by district court in denial of benefits case on grounds that the reports did not pass <u>Daubert</u> scrutiny).

## IV.  <u>Defendant's Motion for Summary Judgment</u>

Defendant argues that it is entitled to summary judgment because Liberty Life's decision to deny plaintiff's claim for long-term disability benefits was not an abuse of discretion.[49] Plaintiff argues that defendant is not entitled to summary judgment because "Liberty abused its discretion in at least two ways . . . namely (1) by not founding its denial of benefits upon concrete evidence; or (2) by not providing [him] with a full and fair review of his claim."[50]

## A.   Applicable Law

"'[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Vega, 188 F.3d at 295 (quoting Firestone Tire & Rubber Co. v. Bruch, 109 S.Ct. 948, 956-957 (1989)).  If the language of the plan grants such discretion, a court will reverse an adminis-trator's decision only for abuse of discretion.  Meditrust, 168 F.3d at 213.  In this case the parties agree that Liberty Life possessed discretionary authority both to construe the terms of the

---

[49]Defendant's Motion for Summary Judgment, Docket Entry No. 9, p. 14.

[50]Plaintiff's Reply to Defendant's Motion for Summary Judgment, Docket Entry No. 11, p. 2.

Plan and to determine eligibility for benefits.[51]  The parties also agree that Liberty Life's construction of plan terms is not at issue but that the issue is, instead, Liberty Life's factual determination that plaintiff was not eligible to receive plan benefits because he was not disabled under the "own occupation" standard.[52]  Factual determinations that are made by the adminis-trator during the course of a benefits review, like that at issue in this case, will be rejected only upon a showing that the administrator abused its discretion.  Id.

When applying the abuse of discretion standard the court's task is to determine whether the administrator acted arbitrarily or capriciously.  Id. at 214.  See also Lain v. UNUM Life Ins. Co. of

_____

[51]See Defendant's Motion for Summary Judgment, Docket Entry No. 9, p. 15 ("The relevant plan document policy specifically states, "Liberty [Life] shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility thereunder.  Liberty Life's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."); Plaintiff's Reply to Defendant's Motion for Summary Judgment, Docket Entry No. 11, p. 2 ("the issue . . . is whether Liberty abused its discretion when it denied the claim").

[52]See Defendant's Motion for Summary Judgment, Docket Entry No. 9 at 15 ("in reviewing Liberty Life's decision to deny long-term disability benefits to Wyatt, the court must apply an abuse of discretion standard"), and p. 16 ("[t]he documentation before Liberty Life at the time it denied Wyatt's appeal clearly supports Liberty Life's decision to deny disability benefits to Wyatt under the 'own occupation' standard.").  See also Plaintiff's Reply to Defendant's Motion for Summary Judgment, Docket Entry No. 11 at p. 9 ("For purposes of this summary judgment proceeding there is no issue concerning the Administrator's interpretation of the plan, only the factual finding(s) are in issue.").

_America_, 279 F.3d 337, 342 (5th Cir. 2002); _Sweatman v. Commercial_
_Union Ins., Co._, 39 F.3d 594, 601 (5th Cir. 1994).  In this circuit
there is only a "semantic, not a substantive, difference" between
the arbitrary and capricious and the abuse of discretion standards
in the ERISA benefits review context.  _Id._ (quoting _Wildbur v. ARCO_
_Chemical Co._, 974 F.2d 631, 635 (5th Cir. 1992)).  "A decision is
arbitrary only if 'made without a rational connection between the
known facts and the decision or between the found facts and the
evidence.'"  _Id._ at 215 (quoting _Bellaire Gen. Hosp. v. Blue Cross_
_Blue Shield of Michigan_, 97 F.3d 822, 828 (5th Cir. 1996)).  An
administrator's decision is not arbitrary and capricious if it is
supported by substantial evidence.  _Id_.  "Substantial evidence is
'more than a scintilla, less than a preponderance, and is such
relevant evidence as a reasonable mind might accept as adequate to
support a conclusion.'"  _Ellis v. Liberty Life Assurance Co. of_
_Boston_, 394 F.3d 262, 273 (5th Cir. 2004) (quoting _Deters v._
_Secretary of Health, Education, and Welfare_, 789 F.2d 1181, 1185
(5th Cir. 1986)).  _See also Richardson v. Perales_, 91 S.Ct. 1420,
1427 (1971) (recognizing that this definition of "substantial
evidence" applies to a variety of contexts).  If the plan adminis-
trator's decision "is supported by substantial evidence and is not
arbitrary or capricious, it must prevail."  _Id_.  Nevertheless, an
"administrator's decision to deny benefits must be 'based on
evidence, even if disputable, that clearly supports the basis for

-18-

its denial.'"  Lain, 279 F.3d at 342 (quoting Vega, 188 F.3d at

299).  "'[W]ithout concrete evidence in the administrative record

that supports the denial of the claim,'" the court must find that

"'the administrator abused its discretion.'"  Id. (quoting Vega,

188 F.3d at 302).

      This standard of review is somewhat less deferential where the

administrator is operating under a conflict of interest.  Here, it

is undisputed that Liberty Life is both the party charged with

determining whether benefit claims will be approved and the insurer

responsible for paying approved claims.  Such administrators have

"a financial incentive to deny the claim and often can find a

reason to do so."  Vega, 188 F.3d at 296.  As Liberty Life

concedes, this situation creates a conflict of interest.[53]  The

Fifth Circuit has adopted a "sliding scale" standard of review for

such cases.  Id.  "Under the 'sliding scale' standard, the court

always applies the abuse of discretion standard, but gives less

deference to the administrator in proportion to the administrator's

apparent conflict."  Id.  The parties agree that a modified abuse

of discretion standard applies to this case.[54]  Since, however,

_____

      [53]Defendant's Motion for Summary Judgment, Docket Entry No. 9,
p. 16 ("because Liberty Life was acting as both the claims
fiduciary and the insurer with regard to Wyatt's claim for
benefits, it will be deemed to have a conflict of interest").

      [54]Id.; Plaintiff's Reply to Defendant's Motion for Summary
Judgment, Docket Entry No. 11, p. 2 ("Wyatt agrees with Liberty
                                                  (continued...)

                              -19-

plaintiff has not presented any evidence with respect to the degree of the conflict, under the Fifth Circuit's "sliding scale" it is appropriate to review Liberty Life's decision with only a modicum less deference than would otherwise be appropriate.  Id. at 301.

**B.   Analysis**

Defendant argues that its denial of plaintiff's claim for benefits for the stated reason that

> the medical documentation does not support limitations
> preventing [plaintiff] from performing the material and
> substantial   duties   of   his   occupation,   as   a
> Superintendent,  throughout  the  Elimination  Period  and
> beyond,[55]

is supported by evidence that plaintiff intended to retire at age 62, by analysis of the Global Assessment of Functioning (GAF) scores assigned to plaintiff, by vocational analyses, and by the

---

[54](...continued)
that the modified abuse of discretion standard is the issue."). See Vega, 188 F.3d at 295 ("there are two ways employee benefit plans may be created:  (1) the employer funds the program and either contracts with a third party who administers the plan or provides for administration by a trustee, individual, committee, or the like; or (2) the employer contracts with a third party that both insures and administers the plan. . . In the latter situation, the administrator of  the  plan  is  self-interested,  i.e.,  the administrator potentially benefits from every denied claim").

[55]Exhibit D included in Defendant's Appendix, Docket Entry No. 10, p. 466.  See also Group Disability Income Policy, Exhibit C included in Defendant's Appendix, Docket Entry No. 10, section 2 (AR at p. 433).

unanimous conclusion of the reviewing psychiatrists that plaintiff "had the capability to work at his own occupation."[56]   Defendant explains that

> it is not the diagnosis that is at issue here; it is
> whether Wyatt was "unable to perform the material and
> substantial duties of his occupation on an Active
> Employment basis because of an Injury or Sickness" in
> accordance with the definition of "disabled" in the plan
> document.
>
> In this regard, Liberty Life requested the opinion of not
> one, but two psychiatrists concerning whether Wyatt had
> restrictions and limitations due to his panic disorder
> that precluded his employment at his job.  Both of these
> physicians were unanimous in stating that Wyatt had the
> capability to work at his own occupation.  Additionally,
> Liberty Life requested a vocational analysis to gain a
> better understanding of Wyatt's job and the stresses
> involved.  Based on these reviews and analyses, and the
> medical records submitted by Wyatt's treating physicians,
> Liberty Life correctly found that Wyatt did not meet the
> definition of "disabled" in the plan document and was not
> eligible to receive benefits from the plan.[57]

Because the court is not persuaded that the evidence cited by the defendant in support of Liberty Life's denial of plaintiff's claim is rationally related to the evidence contained in the administrative record, the court concludes that Liberty Life's denial of plaintiff's claim based on these reasons was arbitrary and capricious.

1.   <u>Intent to Retire</u>

---

[56]Defendant's Motion for Summary Judgment, Docket Entry No.  9, pp. 16-19, esp. 18.

[57]Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 12, pp. 3-4.

Asserting that plaintiff's "panic attacks were severe enough to cause him to seek care in the emergency room on several occasions, but he continued working at his job,"[58] defendant lists the following entries in the administrative record as evidence that plaintiff intended to retire at age 62:  (1) in February of 2000 plaintiff's PCP, Dr. Lawson, wrote in his notes that plaintiff "will retire at 62 yrs;"[59] (2) in October of 2002 Dr. Lawson noted plaintiff was "thinking about disability.  He has a private disability insurance policy;"[60] (3) plaintiff turned 62 in December of 2002;[61] (3) plaintiff's last reported day of work was only two months after his 62nd birthday, in February of 2003;[62] (4) the administrative record contains an undated request from plaintiff to Dr. Lawson written on a page from a plan document requesting assistance with obtaining disability benefits;[63] and (5) on May 1, 2003, plaintiff's psychiatrist, Dr. Ayoub, characterized plaintiff as "retired."[64]  Defendant argues that

---

[58]Defendant's Motion for Summary Judgment, Docket Entry No. 9, p. 16.

[59]AR at p. 268.

[60]Id. at p. 198.

[61]Id. at p. 1.

[62]Id. at p. 354.

[63]Id. at p. 315.

[64]Id. at p. 370.

> [f]rom these facts, it is certainly reasonable to suspect
> whether Wyatt's cessation from work was truly the result
> of a disability or was simply a decision to retire and
> supplement his retirement income with disability
> benefits; thus bringing Wyatt's motives in filing a claim
> for disability benefits into question.[65]

The court is not persuaded that Liberty Life's suspicion that

plaintiff's separation from work was motivated not by disability

but, instead, by an intent to retire and supplement his retirement

income with disability benefits, constitutes substantial evidence

supporting its denial of his claim.  In Vega, 188 F.3d at 302, the

Fifth Circuit stated that

> we will not countenance a denial of a claim solely
> because an administrator suspects something may be awry.
> Although we owe deference to an administrator's reasoned
> decision, we owe no deference to the administrator's
> unsupported suspicions.  Without some concrete evidence
> in the administrative record that supports the denial of
> the claim, we must find the administrator abused its
> discretion.

While the notation in Dr. Lawson's notes from February of 2000

cited by defendant does constitute concrete evidence that plaintiff

intended to retire at age 62,[66] the court is not persuaded that it

or any of the other entries in the administrative record cited by

defendant constitute evidence that plaintiff was motivated to file

his claim to increase his retirement income.  Nor do any of these

entries support Liberty Life's stated reason for denying

plaintiff's claim, i.e., that

---

[65]Defendant's Motion for Summary Judgment, Docket Entry No. 9,
p. 17.

[66]AR at p. 268.

> the medical documentation does not support limitations
> preventing [plaintiff] from performing the material and
> substantial duties of his occupation, as a
> Superintendent, throughout the Elimination Period and
> beyond.[67]

See Lain, 279 F.3d at 342 (denial must be based on evidence that clearly supports the reason stated for denial) (quoting Vega, 188 F.3d at 299).

  2.  Global Assessment of Functioning (GAF) Scores

Defendant argues that "[a]n analysis of the GAF . . . scores assigned to Wyatt by his psychiatrist and psychologist, as well as the reviewing physician, support a finding that Wyatt was capable of working at his job."[68]  Specifically, defendant argues that both of the reviewing psychiatrists assigned plaintiff a GAF of 60, and that in May of 2003 his treating psychiatrist assigned him a GAF of 55.[69]  Recognizing that these scores conflict with the GAF of 45 or below repeatedly assigned to plaintiff by his treating psychologist, defendant argues that the high GAF scores place plaintiff in the moderate category of functioning and indicate that he possesses a continued ability to work at his occupation, while "[t]he conflicting assignment of [a] low GAF by Dr. Marullo[, his treating psychologist,] is clearly indicative of a sympathetic

---

[67]Id. at p. 466.

[68]Defendant's Motion for Summary Judgment, Docket Entry No. 9, p. 17.

[69]AR at pp. 158-161, 163, and 165.

physician who is trying to assist a disability claim, and is not a notation of an accurate portrayal of Wyatt's mental status."[70] Since, however, neither party has provided the court with any analysis of what plaintiff's GAF scores show about his ability to perform the material and substantial duties of his occupation, the court is not persuaded that the relatively high GAF scores accorded plaintiff either by the two reviewing psychiatrists or by his treating psychiatrist constitute substantial evidence supporting Liberty Life's stated reason for denying his claim, i.e., that

> the medical documentation does not support limitations preventing [plaintiff] from performing the material and substantial duties of his occupation, as a Superintendent, throughout the Elimination Period and beyond.[71]

See Lain, 279 F.3d at 342 (denial must be based on evidence that clearly supports the reason stated for denial) (quoting Vega, 188 F.3d at 299).

### 3.   Vocational Analyses

Defendant argues that its denial of plaintiff's claim is supported by a vocational analysis that it requested "to gain a better understanding of Wyatt's job and the stresses involved."[72] The court's review of the record revealed two vocational analyses,

---

[70]Defendant's Motion for Summary Judgment, Docket Entry No. 9, p. 18.

[71]AR at p. 466.

[72]Defendant's Motion for Summary Judgment, Docket Entry No. 9, p. 18.

a labor market survey prepared by WorkSource, International, Inc. (WorkSource), and an analysis prepared by a vocational case manager.  The court is not persuaded that either of these two analyses support defendant's argument that plaintiff was not disabled from performing the material and substantial duties of his occupation because they both focused on the physical as opposed to mental job performance requirements.

(a)  Labor Market Survey

On November 21, 2003, WorkSource prepared a labor market survey for Liberty Life that reported the results of a survey of employers within the national economy regarding plaintiff's occupation of superintendent for oil pipeline construction.[73]  The WorkSource report states that its

discussions with the employers centered on the following questions:

1.  Does the position exist on a full-time basis?

2.  What are the job duties for this position?

3.  What are the physical requirements for this position?

4.  What is the likelihood of persona[l] safety risks at these sites?

5.  What are the types or nature of risks this position may encounter?

6.  What is the approximate pay for this position?[74]

_____

[73]AR at pp. 86-92.

[74]Id. at p. 86.

The WorkSource report then lists ten oil pipeline contractors, all
of whom maintain full-time positions for pipeline superintendents.
The job duties for the superintendent position at each of the ten
contractors surveyed included coordinating crews, meeting
deadlines, and supervising overall pipeline construction.  Some
contractors also require their superintendents to hire personnel
and choose vendors and suppliers.  The job requirements stated for
all of the ten contractors is the same: "Position requires
occasional to frequent walking/standing and occasional lifting/
carrying up to 10 pounds."[75]  The description of personal safety
risks reported is virtually identical for each contractor:

> The employer indicated the personal safety risks and job
> stresses are not out of the ordinary for that line of
> work.  Stresses would be making certain deadlines were
> met.  There have been no instances where personal safety
> has been compromised due to outside influences.  The
> employer stated that once construction begins all permits
> have been obtained, and EPA and legal issues have been
> resolved.[76]

Six employers indicated that "[a]dditionally, the employer
indicated the supervisor is housed in a trailer and typically the
position is management."[77]  One employer indicated that "safety is

_____

[75]Id. at pp. 87-91.

[76]Id.

[77]Id. at pp. 89-91.

-27-

of utmost importance and employees attend weekly classes involving safety issues and how to work safely."[78]

Although all of the employers surveyed stated that "personal safety risks and job stresses are not out of the ordinary for that line of work," the report that WorkSource presented to Liberty Life neither identifies any of the personal safety risks or stresses (apart from the need to meet deadlines) involved in the job, nor analyzes the effect that those risks and stresses can be expected to exert on an individual who, like the plaintiff, suffers from an anxiety disorder.  Moreover, the survey did not include a question asking the surveyed employers to identify mental -- as opposed to the physical -- requirements for the position.  Since plaintiff's impairment is a mental impairment, the exclusion of a question regarding the mental demands of the job precludes the survey from providing relevant, much less substantial, evidence in support of Liberty Life's denial of plaintiff's claim.

(b)   Case Manager's Analysis

On November 5, 2003, a vocational case manager prepared the following analysis for Liberty Life:

> Claim was referred by Mary Lovering for a job vs. occupation.  Van Wyatt was employed as a superintendent (oil pipe line installation) for AMEC.  His job involved overseas travel, and working in reportedly dangerous environments.  He has been diagnosed with panic disorder.

---

[78]<u>Id.</u> at p. 92.

> He experienced a work interruption on 4/2/03. Upon
> review of the job description, the employee's job is
> considered light duty. VCM then reviewed the DOT,
> locating the title of General Superintendent, DOT
> #183.117-014, as well as Superintendent, Oil Field
> Drilling, DOT #181.167-014. These occupations are
> defined as light duty. It is this VCM's opinion that
> this accurately reflects the employee's occupation
> requirements. The description of General Superintendent
> best describes the occupation; however, there are
> elements specific to the oil industry that are reflected
> in the Superintendent, Oil Field Drilling description.
> Upon review of the medical information provided, more
> specifically the Independent Medical Report dated
> 10/30/03 from Dr. Robert Polsky, Psychiatrist, the
> following restrictions and limitations are cited:
> "Mr. Wyatt could perform his own occupation in a
> different environment. A "safer" environment would be
> the most obvious suggestion." Both of these descriptions
> cite the following: Frequency of Conflict Situations:
> Sometimes; Deal with Physically Aggressive People: Almost
> never. While the interpretation of a "safer environment"
> may vary, and it is difficult to quantify "sometimes" and
> "almost never" related to Mr. Wyatt's particular status,
> it is this VCM's opinion that from a physical standpoint,
> Mr. Wyatt can return to his own occupation.[79]

Since the conclusion reached by the vocational case manager is
expressly qualified as based on a "physical standpoint" and did not
mention the mental requirements demanded of either the occupation
in general or the particular position held by the plaintiff, the
court concludes that Liberty Life's reliance on it to support its
denial of plaintiff's claim for benefits based on a mental
impairment is arbitrary and capricious.

4. Unanimous Conclusion of Consulting Psychiatrists

---

[79]Id. at p. 108.

-29-

Defendant argues that its determination that plaintiff was capable of performing his job is supported by the unanimous conclusion of the reviewing psychiatrists, Dr. Polsky and Dr. Brown, that plaintiff "had the capability to work at his own occupation."[80]  Since, however, Dr. Polsky determined only that plaintiff "could perform his own occupation in a different environment.  A 'safer' environment would be the most obvious suggestion,"[81] and Dr. Brown concluded only that "[g]iven the proper motivation . . . and [a]ppropriate psychopharmacologic treatment [that] would include use of longer-acting anxiolytic medications,"[82] the court is not persuaded that either of the reviewing psychiatrists concluded that plaintiff was able to perform the material and substantial duties of his occupation.  On the contrary, the opinion of each reviewing psychiatrist was that plaintiff could return to his job as a superintendent only if certain conditions were satisfied, i.e., if the environment was "safer" than the environment in which he had been working, or if aggressive psychopharmacologic intervention occurred.  Since defendant fails to present any evidence showing either that these conditions were met or that they were possible to meet, the court

---

[80]Defendant's Motion for Summary Judgment, Docket Entry No. 9, p. 18.

[81]AR at p. 102.

[82]Id. at p. 47.

is not persuaded that either of the two reviewing psychiatrists concluded that plaintiff was not disabled because he was capable of performing the material and substantial duties of his occupation as a superintendent when he applied for long-term benefits.


5.  <u>Conclusions</u>

For the reasons explained above the court concludes that defendant's motion for summary judgment must be denied because defendant has failed to point the court to concrete evidence contained in the administrative record showing that plaintiff's anxiety disorder did not disable him from performing the material and substantial duties of his occupation of superintendent of oil pipeline construction when in September of 2003 he applied for long-term disability benefits.


**V.  <u>Plaintiff's Motion to Modify Docket Control Order</u>**

By Order dated August 6, 2004 (Docket Entry No. 8), the court set deadlines for this case that included, <u>inter alia</u>, January 21, 2005, as the deadline for filing dispositive motions, May 6, 2005, as the deadline for filing the Joint Pretrial Order, and May 13, 2005, as the date for Docket Call.  By Order entered May 5, 2005 (Docket Entry No. 16), the court <u>sua sponte</u> vacated the deadline for filing the Joint Pretrial Motion and the date for Docket Call. Plaintiff now moves the court to vacate the deadline for filing

dispositive motions to allow him to file a motion for summary judgment (Docket Entry No. 17). Plaintiff argues that allowing him to file a motion for summary judgment will save time by allowing the issues to be clearly set forth, and asserts that he knows of no prejudice to the other party or delay that would be caused by modifying the docket control order.[83]   Defendant's motion for summary judgment has been pending since January 21, 2005, the parties have unsuccessfully attempted to mediate the case, and a thorough review of the administrative record has persuaded the court that defendant's motion for summary judgment must be denied because the defendant has failed to establish through the arguments presented in its motion that it is entitled to judgment as a matter of law. Since the parties agree that this case must be decided on the administrative record, the court concludes that plaintiff's motion to modify the docket control order should be denied and that, instead, the parties should submit trial briefs so the court may conduct a trial on the record.  See, e.g., Rushing v. Winn Dixie Stores, Inc., 2003 WL 1522939 (E.D. La. 2003).

## VI.  Conclusions and Order

For the reasons explained above, Plaintiff's Motion to Exclude (Part 2 of Docket Entry No. 11) is **DENIED,** Defendant's Motion for Summary Judgment (Docket Entry No. 9) is **DENIED,** and plaintiff's

---

[83]Docket Entry No. 17, p. 1.

Motion to Modify the Docket Control Order (Docket Entry No. 17) is **DENIED.**

The parties are **ORDERED** to submit trial briefs setting forth their arguments and proposed findings of fact and conclusions of law within twenty (20) days from the entry of this Memorandum Opinion and Order.

**SIGNED** at Houston, Texas, on this the 19th day of May, 2005.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE